# Turner et al. v. 1518-20 Locust Street Company

*George V. Strong,* for plaintiffs.

*Robert T. McCracken* and *C. Russell Phillips,* for defendant.

MACNEILLE, P. J., October 15, 1946.—On May 2, 1946, Kathryn C. Watt entered into a written agreement with defendant corporation and with Homer Reed and J. H. William Stambaugh, trading as Reed & Stambaugh, agents for defendant corporation, for

the sale by defendant and the purchase by Kathryn C. Watt of premises 1518-20 Locust Street, Philadelphia, for a consideration of $315,000, payable as follows: $10,000 on the signing of the agreement; $21,500 upon notification by defendant of the approval of the agreement by defendant stockholders, and the balance at settlement, which was required to be on or before August 30, 1946. In executing the agreement Kathryn C. Watt was acting for plaintiffs and on July 12, 1946, by written assignment she formally assigned the agreement of May 2, 1946, to plaintiffs. The performance of the agreement of May 2, 1946, was contingent upon certain conditions contained in paragraph 11 of the contract which provided as follows:

"11. This Agreement of Sale has been approved by the Board of Directors of 1518-20 Locust Street Company, and is contingent only upon the affirmative vote of the holders of at least a majority of the outstanding shares entitled to vote on the question at a special meeting of the stockholders to be called for that purpose and held on or before June 15, 1946. The Board of Directors will recommend the sale and the Voting Trustees will vote in favor of the same if, but only if, prior to such meeting they have received the approval of the holders of voting trust certificates representing at least Fifty-one (51) Percent of the Capital Stock, it being understood that the Directors and Voting Trustees reserve the right to advise all stockholders and voting trust certificate holders of any higher offers which may be received by the Company prior to such meeting of stockholders, in which event any approvals previously received may be withdrawn by the respective voting trust certificate holders. Unless approved by the affirmative vote of the holders of at least a majority of the outstanding shares entitled to vote at said special meeting of stockholders, this Agreement shall become null and void. The Seller shall repay all

monies paid on account by Buyer to Seller, and thereupon there will be no further liability or obligation by either of the parties hereunder."

It is plaintiffs' contention that all of the conditions set forth in paragraph 11 of the agreement have either been performed or the nonperformance caused by defendant's own action and they therefore claim the right to have the agreement carried out by the court ordering the conveyance of the premises to them. Defendant corporation on the other hand denies that the conditions in the agreement have been complied with and contends the agreement is null and void. There is apparently no dispute as to plaintiffs being ready, willing and able to carry out the agreement according to its terms.

On the date of the agreement defendant's issued stock consisted of 2,435 shares, of which 365 shares were treasury stock. Legal title to the remaining 2,070 shares was held by the voting trustees (the trustees were also the board of directors of defendant corporation) under an agreement with the stockholders which expired on March 1, 1943. However, holders of voting trust certificates representing 1925 shares, exclusive of the treasury stock, had agreed to an extension of the voting trust agreement until March 1, 1953. Only 145 shares had not agreed to the extension. The voting trustees under this agreement had authority to sell the property and assets of the corporation upon notification to the holders of the voting trust certificates of the proposed sale, "unless within a period of 30 days from the date thereof the holders of Voting Trust Certificates representing 51% of the capital stock of the Company at such time outstanding shall inform the Voting Trustees in writing that they object thereto. If within said period of thirty days the holders of Voting Trust Certificates representing 51% of the capital stock of the company at such time outstanding shall not have informed the Voting Trustees in writ-

ing of their objections to such sale, the Voting Trustees shall thereupon be vested with power and authority to consummate the same. . . ."

The directors and voting trustees of defendant corporation examined and approved the agreement of sale before it was executed by defendant corporation and in conformity with the agreement called a special meeting of shareholders of defendant for June 15, 1946, at 10 a.m., to vote for or against approval of the sale. Also pursuant to the agreement the voting trustees addressed to holders of the voting trust certificates letters setting forth the terms of the proposed sale and enclosed forms for replies indicating either approval or disapproval of the sale. The voting trustees, prior to June 15, 1946, received written approval of the proposed sale from holders of voting trust certificates representing 1,410 shares of defendant's stock. There is no evidence of record that any of the certificate holders withdrew their approval to the said sale prior to the stockholders' meeting of June 15, 1946. However, on that date the meeting was held and the directors and voting trustees were present but no vote was taken either for or against the approval of the sale. Actually defendant's stockholders, voting through the voting trustees, adopted a resolution adjourning the meeting until 3 o'clock p.m. Friday, July 19, 1946, and further resolving to notify all certificate holders for the first time of a receipt by defendant corporation of a so-called higher offer.

Without deciding at this point whether defendant received a higher offer for the sale of the property prior to the meeting of June 15, 1946, the court under the above facts alone believes plaintiffs are entitled to the relief sought. The only contingency to the agreement of sale of May 2, 1946, is set forth in paragraph 11 of the contract. This paragraph specifically provided:

"The Board of Directors will recommend the sale and the Voting Trustees will vote in favor of the same, if but only if, prior to such meeting they have received the approval of the holders of voting trust certificates representing at least Fifty-one (51) Percent of the Capital Stock."

It is not even disputed by defendant that the voting trustees receved the approval of more than 51 percent of the holders of the voting trust certificates. Paragraph 11 further provided:

". . . it being understood that the Directors and Voting Trustees reserve the right to advise all stockholders and voting trust certificate holders of any higher offers which may be received by the company prior to such meeting of stockholders, in which event any approvals previously received may be withdrawn by the respective voting trust certificate holders."

The evidence in this case clearly indicates that the directors or voting trustees did not advise any of the stockholders or voting trust certificate holders of any higher offers prior to the meeting of June 15, 1946, and of course none of the approvals previously received were withdrawn. This agreement bound the voting trustees to vote approval of the sale on or before June 15, 1946, unless the prior approvals had been withdrawn before that time. Whether this thought be right or wrong there is nothing in the evidence of this case to show that even on June 15, 1946, was any attempt made to obtain any of the withdrawals of the prior approvals.

Performance on or before June 15, 1946, being, we believe, of the essence of the agreement of May 2, 1946, we must hold that any notification to the stockholders or certificate holders and the exercise of their right to withdraw their prior approval had, by the terms of the agreement, to be on or before June 15, 1946. What then remained to be done that wasn't done? Paragraph 11 further provided:

"This Agreement of Sale . . . is contingent only upon the affirmative vote of the holders of at least a majority of the outstanding shares entitled to vote on the question at a special meeting of stockholders to be called for that purpose *and held on or before June 15, 1946.* . . . Unless approved by the affirmative vote of the holders of at least a majority of the outstanding shares entitled to vote at said special meeting of stockholders, this agreement shall become null and void." (Italics supplied.)

Of course this part of the agreement was not carried out by the voting trustees but the same paragraph obligated the board of directors and the voting trustees to vote in favor of the sale at the special meeting of June 15, 1946, if they received approval of 51 percent of the certificate holders and if these approvals were not withdrawn prior to the stockholders' meeting upon notice to them of a higher offer. Such being true, the failure of the voting trustees to vote in favor of the sale is no longer a contingency of the contract, as the nonperformance was wrongfully caused by defendant itself in violation of the agreement and the corporation is not discharged from its duty to carry out the agreement as promised. See Arlotte et al. v. National Liberty Insurance Co., 312 Pa. 442; Nanty-Glo Borough v. American Surety Co., 316 Pa. 408. See also A. L. I. Restatement of Contracts §295, where it is stated:

"295. EXCUSE OF CONDITION BY PREVENTION OR HINDRANCE. If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not discharge the promisor's duty, unless

"(a) the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party; or

"(b) the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party."

And in Williston on Contracts §677, the law is stated as follows:

"677. Prevention of performance of conditions or promises.

"It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure."

In view of the above conclusions the court does not believe it material whether defendant actually received any higher offer for its property prior to the special meeting of June 15, 1946, but since this issue has been raised in the pleadings and in argument the court will state its opinion.

As stated supra, the agreement of May 2, 1946, provided:

". . . it being understood that the Directors and Voting Trustees reserve the right to advise all stockholders and Voting Trust certificate holders of any higher offer which may be received by the company prior to such meeting of stockholders."

It is difficult to see what relevancy this clause has since the directors and voting trustees never advised the certificate holders of any higher bid prior to the special meeting of June 15, 1946, but nevertheless we will discuss whether any such high offer ever was received prior to the meeting.

The evidence is voluminous and in part conflicting as to the exact time the special stockholders' meeting of June 15, 1946, actually commenced. It was scheduled for 10 a.m. and all of the parties were apparently

present at that time. The minutes of the stockholders' meeting prepared by defendant expressly stated:

"A special meeting of the stockholders was held in the office of Frank G. Sayre, Esq., on the second floor of the Pennsylvania Company for Insurances on Lives and Granting Annuities, 15th and Chestnut Streets, Philadelphia, pursuant to call, at 10 o'clock A. M., on Saturday, June 15, 1946."

It has been held that the minutes of the stockholders' meeting are prima facie evidence of the facts stated in them. See Rose v. Independent Chevra Kadisho, 215 Pa. 69; Shuman v. Main, Beaver & Black Creek Mutual Fire Insurance Co., 265 Pa. 38; Krick v. Fairy Silk Co., 311 Pa. 202; KoEune et al. v. State Bank of Schuylkill Haven et al., 134 Pa. Superior Ct. 108. We further have the testimony of Mr. Reed, an important witness, who stated:

". . . at 10 o'clock Mr. Duncan (president of defendant corporation) looked at his watch and implied that the meeting would start". The minutes of the meeting show also that present at the meeting were "Homer Reed, of Reed and Stambaugh; Myer Feinstein, of Myer Feinstein Company; Mr. Lieberman, a stockholder, and Robert C. Walker, counsel for the company".

The preponderance of the credible testimony clearly shows that no earlier than 10 o'clock a.m. the board of directors, voting trustees and the above-named people assembled together and sometime after that the offer of Myer Feinstein was made. The testimony of Mr. Duncan, president of defendant corporation, is that the group assembled in the conference room and Mr. Duncan then said "We all know why we are here". Immediately after that Robert C. Walker said, "Well, gentlemen, if you have any bids for this property, the time has come to present them". Mr. Lieberman then said that he was prepared to bid $325,000, but upon being asked if the offer was in writing, he stated that

it was not. At this time Myer Feinstein spoke up and said:

"We might as well put all the cards on the table. I do have a written offer here for the property, and the price fixed is $327,500." This offer was presented in the form of a letter. Myer Feinstein also presented a check for $15,000, which was not certified. At this point Mr. Sayre asked upon what institution the check was drawn, and Myer Feinstein replied that it was drawn on The Pennsylvania Company, etc. Mr. Sayre then replied: "Well, we can send downstairs and have it certified". In a few moments the check was returned, having been taken downstairs for certification by a messenger.

Mr. Duncan then testified that immediately after this Messrs. Reed, Feinstein and Lieberman were asked to withdraw from the room, and the actual meeting of the stockholders began, the meeting having been called in accordance with notice to the stockholders. At the actual meeting of the stockholders there was no vote taken for or against the sale of the property to the plaintiffs.

Although the court is not firmly convinced the formal meeting did not start at 10 o'clock a.m. and the so-called offer presented after the meeting started, still the determination of whether a higher offer was made prior to the formal meeting may be decided on the premise that no formal meeting began until the real estate agents were asked to leave the conference room sometime after 10 o'clock a.m. The so-called offer made by Myer Feinstein by letter dated June 13, 1946, but not presented by him to the board of directors until the day of the meeting was not by them considered acceptable nor was it accepted in the form first presented. The board of directors and voting trustees realized this and it is admitted that after they began their formal meeting they recalled Feinstein and had

an endorsement typed on the back of the so-called original offer which was as follows:

"P. S. It is my understanding that in consideration of no action being taken at the meeting of the stockholders of the Company held this day with respect to the offer of Reed and Stambaugh, as agents for Kathryn C. Watt, to purchase the said property for $315,-000, and your agreement to notify the security holders of my offer, my offer is firm and binding upon me and will not be withdrawn prior to July 20, 1946."

Assuming for sake of argument that this letter and endorsement then became a firm offer it was only in this form that it was acceptable to the board of directors and voting trustees and it is only in this form that it was accepted as an offer. But this offer with the endorsement was admittedly not made until after Feinstein had left the conference room and the formal meeting commenced. On cross-examination of Myer Feinstein he testified as follows:

"Q. When was this postscript added to the letter of June 13, 1946?

"A. At the day of the meeting of June 15, after 10 o'clock, before the meeting was adjourned.

"Q. Before the meeting was adjourned?

"A. That's right.

"Q. *Was this added before or after the real estate agents had been asked to leave the room?*

"A. *It was added afterwards.*"

(Italics supplied.)

Thus, clearly, even if relevant there was no acceptable higher offer made to the board of directors or voting trustees of defendant corporation prior to the special stockholders meeting of June 15, 1946.

Defendant must fail for even another reason. The burden of proving that a higher offer was received prior to the meeting was upon defendant. It is doubtful whether the so-called offer made by Myer Feinstein

in his letter and endorsement constituted a legally sufficient offer. This offer was not complete in its terms and was conditioned upon the approval and execution of a formal agreement of sale. One paragraph of the alleged offer specifically provided for "an additional sum of $15,000 to be paid upon the approval and execution of the agreement of sale, and the balance in cash at the time of settlement." The alleged offer did not fix the rights of the seller or the buyer in the event of default by either. It ignored altogether the question of insurance and the assignability of the contract, and, as stated above, the additional sum of money was to be paid only if and when the approval and execution of an agreement of sale had been made. Because of the indefiniteness of this alleged offer in that the determination of certain terms were deferred until execution and approval of a written contract, the court is not convinced that it was more than preliminary negotiations for a contract or an invitation for an offer. See Edgcomb v. Clough, 275 Pa. 90; Vitro Manufacturing Co. v. Standard Chemical Co., 291 Pa. 85; Upsal Street Realty Co. v. Rubin, 326 Pa. 327.

However, even assuming that the offer was valid and binding, defendant still had the burden of proving that the offer was a higher offer. The offer of plaintiff was in the sum of $315,000, and the offer of Myer Feinstein was for $327,500, or $12,500 in excess of plaintiffs' offer; but an examination of the so-called offers reveals that the description of the property to be included in the sale was different in each instance. The agreement of sale entered into by plaintiffs provided for the following:

"7. All plumbing, heating and lighting fixtures, and systems appurtenant thereto, and forming a part thereof, as well as all ranges and other permanent fixtures, together with screens, shades and awnings, if any, and all trees, shrubbery and plants now in or on the premises herein intended to be conveyed, unless

specifically excepted in this agreement, are included in the sale and purchase price, and shall become the property of the Buyer at the time of settlement of this transaction. *This clause is considered to mean the inclusion of all equipment necessary for the operation of the building.*" (Italics supplied.)

The so-called offer of Myer Feinstein, however, provided as follows:

"Any and all of the following, if installed in the property and if owned by Sellers, are included in the sale, to wit: all ranges, heating boilers, equipment and apparatus, hot water heaters, gas, electrical and plumbing fixtures and equipment, elevators, dynamos, motors, engines, boilers, building machinery, equipment and facilities, and all fixtures, facilities, equipment and connections annexed to or used in connection with the building, *it being the intention of the parties hereto that all physical property in the building which belongs to Sellers is included in the sale, with the exception of coal which shall be purchased by Buyer from Seller at the time of settlement at cost.*" (Italics supplied.)

Thus, defendant had the burden of showing that his offer was higher for the exact property to be sold, and he has not met such burden here.

Plaintiffs' agreement with defendant provided, as stated above, "the inclusion of all equipment necessary for the operation of the building". Feinstein's offer included "all physical property in the building which belongs to Sellers is included in the sale". It may well be that Feinstein was bargaining for more property than was included in plaintiffs' agreement and if such were true the offer of Feinstein may well have not been an actual higher offer than plaintiffs. Further, the time fixed for settlement in the two offers was different. Under plaintiffs' contract the time for settlement was to be on or before August 30, 1946. Under Myer

Feinstein's offer settlement could be extended to 90 days after July 19, 1946. Certainly the fact that defendant could receive its money earlier from plaintiffs than under Feinstein's offer may have influenced the amount. Because of these differences in the offers, the court cannot say as a matter of law, on the record as developed, that Myer Feinstein's offer was a higher offer than that of plaintiffs.

### Conclusions of law

1. The agreement between plaintiffs' nominee and defendant corporation for the sale of premises 1518-20 Locust Street, Philadelphia, Pa., dated May 2, 1946, is not null and void.

2. Plaintiffs at all times had been ready, willing and able to perform the agreement of May 2, 1946, and had not breached any of its covenants.

3. Plaintiffs having performed all of their covenants, the burden rests on defendant of excusing its voting trustees from performance of their affirmative obligation of voting in favor of the proposed sale and of excusing itself from performance of the terms and conditions of the sale.

4. The holders of the voting trust certificates having approved the proposed sale prior to June 15, 1946, and the stockholders and certificate holders not having been informed prior to this date by the board of directors or voting trustees of any higher offer having been received by the corporation and no withdrawals of the approval of the proposed sale being made prior to the meeting on this date, the voting trustees were obligated at the special meeting of the stockholders called for June 15, 1946, to vote for the approval of the proposed sale.

5. The provisions of the agreement of May 2, 1946, reserving the right of the directors and voting trustees to advise all stockholders and voting trust certificate holders of any higher offers and the right to withdraw

prior approvals must have been exercised prior to the meeting of June 15, 1946, and the failure of the board of directors and the voting trustees to so notify the stockholders and the certificate holders and consequently to receive notice of withdrawal of approval of the proposed sale prior to June 15, 1946, does not excuse the voting trustees from voting in favor of the sale as provided in the agreement.

6. The offer of Myer Feinstein of $327,500 in an acceptable form was not received prior to the formal meeting of the stockholders on June 15, 1946.

7. Defendant has not met his burden of showing that the offer of Myer Feinstein of $327,500 was a higher offer than the offer of plaintiffs of $315,000 for the same property.

8. Defendant corporation by its voting trustees wrongfully refused, in violation of the agreement of May 2, 1946, to vote for approval of the proposed sale to plaintiffs.

9. Plaintiffs are entitled to have the agreement of sale of May 2, 1946, carried out by defendant.

10. Plaintiffs are entitled to equitable relief in these proceedings.

11. Defendant corporation, by its voting trustees having wrongfully refused to vote for approval of the proposed sale to plaintiffs, cannot now take advantage of its refusal to vote in favor of the proposed sale to defeat the rights of plaintiffs herein.

12. Plaintiffs are entitled to have the premises 1518-20 Locust Street, Philadelphia, Pa., along with such equipment necessary for the operation of the building as set forth in paragraph 7 of the agreement of sale, transferred to them.

13. Defendant corporation may not convey or encumber said premises and property 1518-20 Locust Street, Philadelphia, Pa., in violation of its agreement with plaintiffs of May 2, 1946.

## Decree nisi

And now, to wit, October 15, 1946, upon consideration of the foregoing, it is ordered, adjudged and decreed that defendant corporation transfer and convey premises 1518-20 Locust Street, Philadelphia, Pa., along with all equipment necessary for the operation of the building, to plaintiffs herein, in accordance with, and on the terms stated in, the agreement dated May 2, 1946. Defendant corporation is hereby enjoined and restrained permanently from hereafter conveying, selling, encumbering or transferring to any person or persons other than plaintiffs the property included in the agreement of sale of May 2, 1946.

## Opinion sur exceptions

*Robert T. McCracken* and *C. Russell Phillips*, for exceptants.

*George V. Strong*, contra.

MacNEILLE, P. J., and MILNER, J., November 7, 1946.—This case is before the court on exceptions of both plaintiffs and defendant to the adjudication of the chancellor.

We have carefully considered all of the evidence in the case and although we are in accord with the chancellor's conclusions, we believe that certain requests for findings of fact of both plaintiffs and defendant which were not affirmed by the chancellor should be at this time. . . .

After carefully considering the testimony, we find that plaintiffs' exceptions nos. 1 through 5 should be allowed, and we accordingly modify our findings of fact nos. 5, 18 and 20 contained in the adjudication so that they shall read as follows: . . .

18. The meeting of defendant's stockholders called for 10 a.m. June 15, 1946, to consider approval or disapproval of the sale provided for in the agreement between plaintiffs and defendant was actually held at

10 a.m. June 15, 1946. The minutes of said meeting of defendant's stockholders show that the following were present:

"Present were:

| Name | Number of Shares |
|------|------------------|
| Stephen G. Duncan | 2865 shrs. of which amount |
| Frank G. Sayre | 365 represented Treasury |
| Bertram M. Wilde | stock |
| Voting Trustees | |

representing a majority of the outstanding shares, and therefore, a quorum. Homer Reed, of Reed & Stambaugh, Myer Feinstein, of Myer Feinstein Company, Mr. Lieberman, a stockholder and Robert G. Walker, Counsel for the Company, were also present."

20. On June 15, 1946, after 10 o'clock a.m., and the commencement of the stockholders' meeting there was delivered to Stephen G. Duncan a paper writing which defendant contends is a higher offer to purchase its said real estate for a price of $327,500. This paper writing is in the form of a letter and contains two parts, the body of the letter and the postscript written upon the back of the letter. The writing was originally presented without the postscript sometime between 10 o'clock a.m. and 10:30 a.m. on June 15, 1946, and the postscript was added sometime after 10:30 a.m. on June 15, 1946, following a private conference between the voting trustees and their counsel. When such paper writing was presented to Stephen G. Duncan it was accompanied by a check for $15,000 and this check was subsequently caused to be certified.

The substituted findings of fact nos. 18 and 20 are allowed after a careful consideration of all the testimony. Defendant itself introduced as part of its case the minutes of the meeting of stockholders held on June 15, 1946. As stated in our prior adjudication the minutes of a stockholders' meeting are prima facie evidence of the facts contained therein. See Rose v. Inde-

pendent Chevra Kadisho, 215 Pa. 69; Shuman v. Main, Beaver & Black Creek Mutual Fire Insurance Co., 265 Pa. 38; Krick v. Fairy Silk Co., 311 Pa. 202; KoEune et al. v. State Bank of Schuylkill Haven et al., 134 Pa. Superior Ct. 108.

The minutes of this stockholders' meeting, prepared by defendant, expressly state:

"A special meeting of the stockholders of 1518-20 Locust Street Company was held in the office of Frank G. Sayre, Esq., on the 2nd floor of the Pennsylvania Company for Insurances on Lives and Granting Annuities, 15th and Chestnut Streets, Philadelphia, Pennsylvania, pursuant to call, at ten o'clock a.m., on Saturday, June 15, 1946."

The minutes further stated that present at this meeting were:

"Homer Reed of Reed & Stambaugh, Myer Feinstein of Myer Feinstein Company, Mr. Lieberman, a stockholder, and Robert C. Walker, counsel for the company."

From the facts contained in these minutes and from the other credible testimony of plaintiffs' witnesses, we are now convinced that the stockholders' meeting of June 15, 1946, commenced at 10 o'clock a.m. and that the so-called offer of Myer Feinstein for $327,500 was not received by defendant or made in the form of an offer by Myer Feinstein until after the special meeting of stockholders called for that date at 10 a.m. had actually commenced.

It is difficult for us to understand why the above-mentioned people were reported in the minutes as being present if they were in fact excluded before the actual meeting began. Also if, as contended by defendant, the stockholders' meeting did not begin until after the exclusion of the above-mentioned people, including Mr. Lieberman, it is quite unusual that Mr. Lieberman, a stockholder of the company, would be

asked to leave the conference room. The only logical conclusion seems to be that the meeting began as provided in the notice calling the meeting, namely, sharply at 10 o'clock a.m. on June 15, 1946; and this we now so find. . . .

Defendant's exceptions nos. 42, 43 and 48 have been dismissed above, but we deem it important to comment on them as, at the argument before the court en banc, it was contended by defendant's counsel that plaintiffs are estopped from asserting any rights under the agreement of sale. Defendant, in support of this argument, claims that at least by July 8, 1946, plaintiffs were aware that the majority of defendant's stockholders and certificate holders had withdrawn their approval of sale to plaintiffs, and that at the special stockholders' meeting on July 19, 1946, the property was put up for sale and an agreement obtained to sell the property for $384,500. It is contended that at this meeting one of plaintiffs was present and remained silent. This, of course, would not bar plaintiffs because of laches or estoppel, as they made known in a letter to Mr. Duncan, president of the defendant company, dated July 12, 1946, sent by Reed & Stambaugh, in which letter it was concluded that plaintiffs did not agree that the contract for the sale of the premises was null and void. It may well be that if plaintiffs sat by and permitted the premises to be sold to an innocent purchaser and the purchaser were now complaining that there would be some merit in the plea of defendant that plaintiffs are estopped. But here defendant knew that plaintiffs did not agree that the contract was null and void; and where defendant is not the innocent party, there is certainly no estoppel insofar as plaintiffs are concerned.

We therefore make the following

*Decree*

And now, to wit, November 7, 1946, upon consideration of the foregoing, it is ordered, adjudged and de-

creed that defendant corporation transfer and convey premises 1518-20 Locust Street, Philadelphia, Pa., along with all equipment necessary for the operation of the building, to plaintiffs herein, in accordance with and on the terms stated in the agreement dated May 2, 1946. Defendant corporation is hereby enjoined and restrained permanently from hereafter conveying, selling, encumbering or transferring to any person or persons other than plaintiffs the property included in the agreement of sale of May 2, 1946.

NOTE.—An appeal from the foregoing decree has been abandoned.